1998 SD 61

**STATE of South Dakota, DIVISION OF INSURANCE, Plaintiff and Appellee,**

and

**The South Dakota Land Title Association, Inc., Intervenor and Appellee,**

v.

**NORWEST CORPORATION, Norwest Mortgage, Inc., and American Land Title Company d/b/a ATI Title Company, Defendants and Appellants.**

No. 20239.

Supreme Court of South Dakota.

Considered on Briefs April 27, 1998.

Decided June 24, 1998.

Mark Barnett, Atty. Gen., Timothy E. Reilly, Asst. Atty. Gen., Division Counsel, South Dakota Division of Insurance, Jeffrey P. Hallem, Asst. Atty. Gen., Pierre, for plaintiff and appellee State Division of Insurance.

Mark A. Moreno of Schmidt, Schroyer & Moreno, Pierre, for intervenor and appellee South Dakota Land Title.

Timothy M. Engel of May, Adam, Gerdes & Thompson, Pierre, for defendants and appellants.

MILLER, Chief Justice.

[¶ 1.] In this appeal, we hold that appellants are engaged in the title insurance business and are subject to regulation by the South Dakota Division of Insurance (Division).

[¶ 2.] Norwest Mortgage, Inc. (NMI), American Land Title Company, Inc., d/b/a ATI Title Company (ATI), and Norwest Corporation (Norwest),[1] through a series of related contracts, market and sell a program called Title Option Plus (TOP) to residential mortgage loan applicants. TOP is an alternative to title insurance, and enables the loans to be sold to secondary market purchasers. The South Dakota Division of Insurance (Division) requested that the parties refrain from marketing and selling TOP in South Dakota and, when they refused, it brought suit. The trial court held that TOP was insurance, and Norwest Parties were engaged in the "insurance business" and subject to regulation by Division. We affirm.

### FACTS

[¶ 3.] NMI is engaged in the business of making and selling loans secured by first and second mortgages on real estate. It is a wholly owned subsidiary of Norwest Nova, Inc., which is a wholly owned subsidiary of Norwest. ATI is a wholly owned subsidiary of NMI, and is engaged in the business of performing title searches for real property and is a title insurance agency.

[¶ 4.] The Federal Reserve Board denied Norwest Parties permission to form a nonbank subsidiary that would issue title insurance policies on mortgage loans made by NMI and other Norwest lenders because the

---

1. For ease of reference, when Norwest, ATI, and NMI are referred to collectively, they will be referred to as "Norwest Parties."

Federal Bank Holding Act of 1956 prohibited such arrangements. Norwest Parties then developed TOP as an "alternative" to title insurance.

[¶ 5.] Prior to the implementation of TOP, NMI required borrowers to obtain title insurance as a condition of a loan. In 1995, it began offering TOP to South Dakota borrowers seeking to refinance their mortgage loans.

[¶ 6.] It is important to understand how TOP works. When borrowers apply to NMI for a loan to refinance an existing first-mortgage loan, they are told that the purchase of either TOP or a lender's title insurance policy is necessary. If the borrower chooses TOP,[2] NMI has ATI examine the public records relating to the real estate to be mortgaged. ATI issues a "preliminary title condition report" indicating the results of the search and what, if anything, must be done to assure that NMI has a first-priority mortgage lien. If NMI decides to issue a loan, and the loan is closed, ATI issues a "Final Title Condition Certificate" to NMI, which "certifies unto [NMI]" that its mortgage "evidences a valid, first, senior and paramount lien" in NMI's favor, and that the borrower has a fee simple title.

[¶ 7.] Most of NMI's loans are subsequently sold within a secondary market. They are sold to entities such as the Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Federal National Mortgage Association ("Fannie Mae").[3] Freddie Mac generally requires the mortgage loans it purchases to be covered by a policy of title insurance and the protection and benefits of such a policy to run directly to it. Freddie Mac also purchases loans from NMI that are covered by TOP rather than traditional title insurance.

[¶ 8.] NMI enters into a "Master Agreement" with Freddie Mac when selling it a loan. This agreement provides for NMI's contractual undertaking and generally states: (1) that the loan constitutes a valid first lien, and (2) in the event a claim or lawsuit arises involving title issues that could impair Freddie Mac's first-lien position or the value of the underlying property, NMI will act to protect Freddie Mac's interest, including retaining counsel and paying for all defense costs or repurchasing the loan. Finally, a "Guarantee Agreement" is entered into between Norwest and Freddie Mac, whereby Norwest guarantees the performance of NMI to Freddie Mac.

[¶ 9.] Division requested that Norwest Parties voluntarily refrain from marketing and selling TOP to borrowers in South Dakota. When that request was refused, Division brought suit to determine if TOP was the equivalent of title insurance, thus making Norwest Parties subject to regulation by Division. South Dakota Land Title Association (SDTLA) was granted leave to intervene, and filed a separate complaint seeking declaratory relief. The trial court determined that TOP was insurance and Norwest Parties were engaged in the insurance business and subject to regulation by Division.

[¶ 10.] Norwest Parties appeal the following issues:

1. Whether TOP is title insurance.
2. Whether Norwest Parties are engaged in the business of title insurance in South Dakota.

## STANDARD OF REVIEW

[¶ 11.] In this case, the evidence before the trial court was in the form of stipulated facts, exhibits, and depositions. Thus, "we are free to determine the facts as if presented here for the first time unaided by any deference to the trial court." *Muhlenkort v. Union County Land Trust,* 530 N.W.2d 658, 660 (S.D.

---

2. There was testimony that everyone presented with the option has chosen TOP.

3. For ease of reference, the term "Freddie Mac" will be used to refer to both Freddie Mac and Fannie Mae. Both have the same contractual agreements with Norwest and NMI. Another entity involved in the secondary mortgage area is The Government National Mortgage Association

("Ginnie Mae"). Unlike Freddie Mac, Ginnie Mae does not purchase mortgage loans. It guarantees the timely payment of securities issued by lenders that are backed by pools of government-assisted or -insured mortgages. There is no master agreement between NMI and Ginnie Mae, nor is there a guarantee agreement between Norwest and Ginnie Mae.

1995) (citing *State Auto. Cas. Underwriters v. Ruotsalainen,* 81 S.D. 472, 478–79, 136 N.W.2d 884, 888 (1965); *State v. Abourezk,* 359 N.W.2d 137, 142 (S.D.1984); *Zacher v. Homestake Mining Co.,* 514 N.W.2d 394, 395 (S.D.1994)). We review a trial court's conclusions of law under a de novo standard of review. *Id.*

## DECISION

[¶ 12.] **1. Whether TOP is title insurance.**

[¶ 13.] Norwest Parties argue that TOP is not title insurance. Rather, they assert it is either a warranty or self-insurance neither of which are subject to regulation. We do not agree.

[¶ 14.] Before addressing Norwest Parties' claims that TOP is either a warranty or self-insurance, we must initially address their argument that it would be incorrect to consider all the separate agreements together. They claim the agreement between NMI and ATI is separate from the agreement between NMI and Freddie Mac, and that between Norwest and Freddie Mac. Norwest Parties claim that to lump all the agreements together would impermissibly ignore their separate legal identities. However, under our holdings, separate writings which are executed as part of a single transaction should be interpreted together. *Baker v. Wilburn,* 456 N.W.2d 304, 306 (S.D.1990). This is true even if the parties to all of the writings are not the same, and the writings are executed on different dates. *Id.*

[¶ 15.] Under the TOP program, ATI issues a title certificate to NMI. NMI enters into a master agreement with Freddie Mac and is allowed to do so because of the title certificate. Then, Norwest enters into a guarantee agreement with Freddie Mac to provide protection in case NMI cannot comply with its contractual obligations in the master agreement. It is obvious that these three separate writings all involve one single transaction and must be read together as one contract. *See Norwest Corp. v. State, Dep't of Ins.,* 253 Neb. 574, 571 N.W.2d 628, 634 (1997) (holding that these three contractual undertakings must be read together).

[¶ 16.] We now turn to the remaining arguments of Norwest Parties.

### a. Risk Shifting

[¶ 17.] Norwest Parties' primary claim is that TOP is not insurance because there is no "shifting of the risk." They argue that under our statutory definitions of "insurance" and "title insurance" there must be a risk shift and also a contract of indemnity, and that these elements do not exist with TOP.

[¶ 18.] SDCL 58–1–2(10) defines insurance as: "[A] contract whereby one undertakes to indemnify another or to pay or provide a specified or determinable amount or benefit upon determinable contingencies[.]" SDCL 56–3–1 defines indemnity as "a contract by which one engages to save another from a legal consequence of the conduct of one of the parties or of some other person." SDCL 58–9–33 defines "title insurance" as "the insurance of owners of property or others having an interest therein or liens or encumbrances thereon, against loss by encumbrance, or defective titles, or invalidity, or adverse claim to title."

[¶ 19.] "'The essence of an insurance contract is the shifting of the risk of loss from the insured to the insurer.'" *In re Request for Opinion of the Supreme Court,* 379 N.W.2d 822, 827 (S.D.1985) (quoting *American Nurses Ass'n v. Passaic General Hosp.,* 192 N.J.Super. 486, 471 A.2d 66, 69 (1984)). "Shifting the risk" can be defined as "the transfer of the impact of a potential loss from the insured to the insurer." *Clougherty Packing Co. v. Comm'r of Internal Revenue,* 811 F.2d 1297, 1300 (9th Cir.1987).

[¶ 20.] Norwest Parties rely on the decision of the Virginia Supreme Court in *Lawyers Title Ins. Corp. v. Norwest Corp.,* —— Va. ——, 493 S.E.2d 114 (1997). We are not bound by the Virginia decision and do not find it persuasive for a number of reasons. First, unlike South Dakota, Virginia does not have a statutory definition of "insurance." Also, that court did not review this issue under a de novo standard. Finally, the Virginia decision was a sharply divided 4–3 decision, and we are more persuaded by the

dissent., See *Id.* 493 S.E.2d at 117–20 (Whiting, J., dissenting).

[¶ 21.] We first must determine if there is a shifting of the risk between a borrower and NMI. Norwest Parties, pointing to the mortgage documents as proof, claim there is no such risk shifting. The mortgage executed by a borrower contains a warranty that the mortgage lien will have a first-priority status. Borrowers, at the time of closing, also sign an affidavit in which they agree to indemnify NMI in the event that certain "off record" defects imperil the first-lien status of the mortgage. This appears to indicate that the risk at all times stays with a borrower and never shifts to NMI. However, as the dissent in *Lawyers Title* noted, "whether a particular contract is one of insurance does not depend on what it is called, but what it does." 493 S.E.2d at 119 (Whiting, J., dissenting) (citing *Associated Hosp. Serv. v. Mahoney*, 161 Me. 391, 213 A.2d 712, 721 (1965); *People v. Roschli*, 275 N.Y. 26, 9 N.E.2d 763, 764 (1937) (other citation omitted)).

[¶ 22.] We must closely examine what TOP entails. Norwest indicates in various documents that TOP is not title insurance. However, if that were all that was required, anyone could avoid regulation by Division simply through documentary disclaimers. *See Morgan v. City of Ruleville*, 627 So.2d 275, 283 (Miss.1993) (McRae, J., concurring in part and dissenting in part) (noting that just because an entity stated it was engaged in "self-insurance" and thus should not be regulated, such should not be controlling because "[a] wolf in sheep's clothing would, no doubt, purport to identify himself as a sheep."). Norwest Parties represent to a borrower that, while TOP replaces lender's title insurance, it is not a substitute for borrower's title insurance. However, they also represent to a borrower that TOP offers them indirect protection "since the lender will clear up major title defects to protect itself which in turn would clear up the defect[s] for the [borrower]." It is also Norwest Parties' policy to not pursue a borrower if a title defect arises unless there was fraud on the part of the borrower. Thus, since the borrower would normally retain the risk of a defect in title, Norwest Parties' policy and representations that TOP will at least partially protect a borrower, create a shifting of the risk.

[¶ 23.] We also find that there is a shifting of the risk when Norwest Parties sell a loan to Freddie Mac on the secondary market. Norwest Parties claim that, when a loan secured by a mortgage is made, NMI, as the originating lender, bears the risk that the loan is not secured by a first mortgage. They argue that when they sell a loan to Freddie Mac and warrant it is secured by a first mortgage, they are merely retaining the risk, not shifting it. We do not agree.

[¶ 24.] Freddie Mac has agreed to accept TOP as an alternative to title insurance when it purchases a loan. NMI issues a master agreement to Freddie Mac when it sells a loan, and this agreement generally states that (1) the loan constitutes a valid first lien, and (2) in the event a claim or lawsuit arises involving title issues that could impair Freddie Mac's first-lien position or the value of the underlying property, NMI agrees to act to protect Freddie Mac's interest, including retaining counsel and paying for all defense costs, or repurchasing the loan.

[¶ 25.] Although the Nebraska Supreme Court does not define insurance in terms of shifting the risk, we find its statements on this issue persuasive. That court held that "at the time NMI sells a mortgage to Freddie Mac, NMI no longer has an insurable interest after the sale, and that the owner of the mortgage, Freddie Mac, bears the risk." *Norwest Corp.*, 571 N.W.2d at 637. We find this opinion more persuasive than that of the Virginia Supreme Court in *Lawyers Title*, 493 S.E.2d at 116, holding:

> When Norwest Mortgage makes a loan, it is a mortgage loan secured by a lien interest in the realty. At that point in time, Norwest Mortgage incurs a title risk that the loan is not properly secured or that its lien is not first in priority. Then Norwest Mortgage sells that mortgage loan into the secondary market. At that point, Norwest Mortgage makes a warranty and representation to the secondary market purchaser that the loan is a first mortgage loan.

[¶ 26.] Were we to agree with the Virginia Court we would be ignoring the fact that, absent the master agreement, Freddie Mac bears the risk. When Freddie Mac purchases a loan it becomes, in essence, the owner of that loan. If there is a claim against the title of the underlying property, Freddie Mac would bear the risk. That is why Freddie Mac requires either title insurance or TOP as a condition to its purchasing a loan. We reject Norwest Parties' argument that since NMI agrees to be responsible for any defects in title, the risk does not shift because Freddie Mac never receives the risk in the transaction. That ignores the underlying realities of risk absent the other agreements. That is also why Freddie Mac requires Norwest to guarantee NMI. Such an agreement would be unnecessary if NMI always maintained the risk.

### b. Warranty

[¶ 27.] Norwest Parties next claim that TOP is merely a warranty from NMI to Freddie Mac that they are selling a first-lien mortgage. We disagree. As one court has explained:

> Basically, a warranty is issued to provide protection against defects or failures in a product, whereas an insurance policy is issued to provide reimbursement or indemnity based on an accident or occurrence unrelated to any defect or failure in the product.

*Rayos v. Chrysler Credit Corp.*, 683 S.W.2d 546, 548 (Tex.App.1985); *see also Griffin Sys., Inc. v. Washburn*, 153 Ill.App.3d 113, 106 Ill.Dec. 330, 505 N.E.2d 1121, 1124 (1987) (holding that a distinguishing feature between a warranty and an insurance policy is that with a warranty, there is no "risk accepted which the company, because of its expertise, is unaware of.").

[¶ 28.] We agree with the Nebraska Supreme Court holding that if there was a "product" in this case, it was the first-lien mortgage of record, and "NMI can warrant the first-lien mortgage only to the extent of an adverse claim because of a negligently prepared title search. In indemnifying Freddie Mac from unrecorded risks, NMI goes beyond a simple warranty on the prod-

uct and in fact provides insurance." *Norwest Corp.*, 571 N.W.2d at 636; *see also Ollendorff Watch Co. v. Pink*, 279 N.Y. 32, 17 N.E.2d 676, 677 (1938) (holding that a "warranty" was really insurance because it went beyond a mere guarantee of the quality and performance of a watch and protected against "hazard[s] having nothing to do with the make or quality of the watch."). Therefore, rather than merely warranting that the title report and certificate from ATI are accurate and complete, NMI also agrees to take responsibility for any unknown and unforeseen risks that might impair Freddie Mac's rights. This is title insurance and not a warranty.

### c. Self-insurance

[¶ 29.] We also hold that TOP is not unregulated self-insurance. Self-insurance is "[t]he practice of setting aside a fund to meet losses instead of insuring against such through insurance. A common practice of business is to self-insure up to a certain amount, and then cover any excess with insurance." *Kent v. Lyon*, 1996 SD 131, ¶ 19, 555 N.W.2d 106, 111 (citation omitted). It has also been described as "risk retention," or a situation where "an entity, rather than purchasing insurance to cover potential losses, elects to pay off its losses as they arise, or ... set[s] aside fixed sums into a reserve account to pay off intermittent losses." *State v. Continental Cas. Co.*, 126 Idaho 178, 879 P.2d 1111, 1116 (1994).

[¶ 30.] Norwest Parties point to the case of *Richardson v. GAB Business Servs., Inc.*, 161 Cal.App.3d 519, 207 Cal.Rptr. 519 (1984), as evidence that the TOP program is not insurance but more akin to self-insurance. They once again claim the essential element is that there is no shifting of the risk. In *Richardson*, it was held that Safeway Stores' practice of paying tort claims out of its own pocket to persons injured in its stores was not insurance because there was no shifting of the risk of loss. *Id.* 207 Cal.Rptr. at 521.

[¶ 31.] We believe the situation with TOP is different than in *Richardson*. As we held above, TOP does involve a shifting of the risk. Also, TOP involves more than a situation where an entity merely sets aside a certain sum of money to cover its losses.

With TOP, borrowers are paying a fee that varies dependent on the risk of loss and the value of the loan. The fee schedule for TOP is based upon the fee schedule for a title insurance policy, only at a slightly reduced rate. A portion of the fee (5%) is then set aside in a reserve fund to cover Norwest Parties' potential liability. The testimony of Michael Fahey, president of ATI, explained the purpose of the reserve system and how it is established:

Q. Let's talk about the message you set up for claims administration in the TOP program. Tell me what it is.

A. [Fahey] Ours is simple. ATI, we monitor any claim like we always do our claims, report, set aside certain reserves for it, if we miss something on record, just like we normally do.

Q. How are you setting aside reserves for the TOP program?

A. We have—ATI is the only one that I'm aware of that's setting aside anything on this.

Q. Any reserves?

A. Any reserves, and that's for our missed mortgages or missed whatever.

Q. What is the reserve set aside to cover?

A. Anything we miss of record. What we normally would with the title insurance, a title search issue.

Q. How are you determining how much to set aside?

A. We declared that we were going to try to put five percent away of our earnings— of our premiums, sorry.

Q. You don't want to use the word premium, do you?

A. No. Fees. Thanks. Hard to switch.

Norwest Parties are charging their customers a "fee" for TOP, and setting aside a portion of that variable fee to cover any potential losses that have shifted to them. That differs from setting aside one's own funds to cover losses.

[¶ 32.] The Nebraska Supreme Court likewise held that TOP was not self-insurance:

The present case does not involve self-insurance.... [W]hen NMI owns the mortgage, it bears the risk. When NMI

sells the mortgage to Freddie Mac, however, it no longer owns the mortgage and does not have an insurable interest. Therefore, Freddie Mac, the owner of the mortgage, bears the risk.... For [Norwest Parties'] actions to be considered self-insurance, NMI would have to retain an insurable interest in the mortgages sold to Freddie Mac. Instead, Freddie Mac assumes the risk once it purchases the mortgages and looks to NMI and Norwest only to indemnify it from such a risk. Further, the primary obligation in the present case is the promissory note for the mortgage given by the borrower to NMI. The borrower is thus the primary obligor. When NMI sells the loan with TOP protection to Freddie Mac, however, NMI now assumes the risk of loss.

*Norwest Corp.*, 571 N.W.2d at 635. We agree and hold that, because of the shifting of the risk and the operation of the program, TOP is insurance and not unregulated self-insurance.

[¶ 33.] **2. Whether Norwest Parties are engaged in the business of title insurance in South Dakota.**

[¶ 34.] Finally, Norwest Parties claim they are not engaged in the insurance business in South Dakota and, therefore, are not subject to regulation. SDCL 58–1–5 provides: "No person shall engage in or transact an insurance business in South Dakota, or act relative to a subject of insurance resident, located or to be performed in South Dakota, without complying with the applicable provisions of this title." SDCL 58–1–2(11) defines "insurance business" as "includ[ing] the transaction of all matters pertaining to a contract of insurance, both before and after the effectuation of that contract, and all matters arising out of that contract or any claim thereunder[.]"

[¶ 35.] The real basis of Norwest Parties' argument is that there is no contract of insurance. Here again Norwest Parties focus on keeping NMI, ATI, and Norwest separate. But, as indicated above, we must look at the realities of the TOP program. NMI, ATI, and Norwest are all related companies. A borrower pays a fee for TOP, and that fee is based on the amount of the loan which

correlates with NMI's potential liability. While NMI does not directly receive the TOP fee, its subsidiary, ATI, does, and it sets aside a portion of that fee to cover any potential losses. All the entities and agreements must be examined together. TOP was created to replace lender's title insurance. It is marketed as a cheaper alternative to title insurance. There is a shifting of the risk between a borrower and NMI and Freddie Mac and NMI. While Norwest Parties have tried to avoid being regulated as insurance, when one looks at the core of the program, it is title insurance as defined in South Dakota and, accordingly, is subject to regulation by Division.

[¶ 36.] Affirmed.

[¶ 37.] SABERS, AMUNDSON, KONENKAMP and GILBERTSON, JJ., concur.

